IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| BALDWIN GRAPHIC SYSTEMS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 06-77 (JJF) |
| | ) | |
| FIBERWEB SIMPSONVILLE INC. and | ) | |
| FIBERWEB, INC. | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF BALDWIN GRAPHIC SYSTEMS, INC.'S OPENING MARKMAN
BRIEF FOR U.S. PATENT NOS. RE 35,976 AND 5,974,976**

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Jack B. Blumenfeld (#1014)
Julia Heaney (#3052)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE  19899-1347
(302) 658-9200
jheaney@mnat.com
  *Attorneys for Plaintiff,*
  *Baldwin Graphic Systems, Inc.*

OF COUNSEL:

James W. Gould
Keith J . McWha
Seth Silverman
MORGAN & FINNEGAN, LLP
3 World Financial Center
New York, NY  10281-2101
(212) 415-8700

Dated: December 14, 2007

25

# TABLE OF CONTENTS

Page(s)

I.      INTRODUCTION ........................................................................................................1

II.     APPLICABLE LEGAL PRINCIPLES OF PATENT CLAIM
        CONSTRUCTION......................................................................................................2

        A.      Patent Claims Are Interpreted In View Of The Claim Language,
                Patent Specification And Prosecution History...........................................2

                1.      The Claim Language Is the "Analytical Focus" of Claim
                        Construction.......................................................................................2

                2.      When Construing Claims The Patent Specification And
                        Prosecution History Should Be Considered................................4

        B.      Limits On The Use Of Extrinsic Evidence In Claim Interpretation .......................4

III.    THE REISSUE PATENT DESCRIBES AND CLAIMS A PRE-
        PACKAGED, PRE-SOAKED CLEANING SYSTEM AND METHOD
        FOR MAKING THE SAME ......................................................................................5

        A.      The Invention Of The Reissue Patent ......................................................5

        B.      The Asserted Claims Of The Reissue Patent ...........................................7

        C.      The Construction Of The Reissue Patent Claims ...................................8

                1.      Independent Claims 28 and 32-Disputed Term "A Pre-
                        Soaked Fabric Roll" Does Not Mean "A Single Pre-Soaked
                        Fabric Roll"......................................................................................8

                2.      Independent Claims 28 and 32-Disputed Term "Sealed
                        Sleeve" Does Not Mean "A Heat Sealed Sleeve" ....................10

                3.      Independent Claim 28-Disputed Term "In Contact With"
                        Does Not Mean "Direct Contact" ...............................................11

                4.      Independent Claims 28 and 32 Disputed Terms "Disposed
                        Around" and "Disposed Therearound" Do Not Require
                        "Direct Contact"...........................................................................13

IV.     THE '976 PATENT DESCRIBES AND CLAIMS A CLEANING
        SYSTEM AND PROCESS FOR MAKING SAME EMPLOYING
        REDUCED AIR CLEANING FABRIC.....................................................................14

        A.      The Invention Of The '976 Patent ...........................................................14

B.    The Asserted Claims Of The '976 Patent ..................................................17

C.    The Construction Of The '976 Patent Claims...........................................19

    1.    Independent Claims 1 and 14-Disputed Term "Reduced Air Content Cleaning Fabric" Is Not Limited To "A Fabric Whose Air Content Has Been Reduced Prior To Being Wound On A Roll" ..................................................................................19

V.    CONCLUSION...............................................................................................22

## TABLE OF AUTHORITIES

CASE(S)                                                                                    PAGE(S)

*AbTox, Inc. v. Exitron Corp.*,
    122 F.3d 1019, modified on reh'g., 131 F.3d 1019 (Fed. Cir. 1997) ........................................3

*Altiris v. Symantec Corp.*,
    318 F.3d 1363 (Fed. Cir. 2003).................................................................................................9

*Bell & Howell Document Management Prods. Co. v. Altek Systems*,
    132 F.3d 701 (Fed. Cir. 1997)..................................................................................................4

*Chef American, Inc. v. Lamb-Weston, Inc.*,
    358 F.3d 1371 (Fed. Cir. 2004)...............................................................................................3

*CollegeNet Inc. v. ApplyYourself, Inc.*,
    418 F.3d 1225 (Fed. Cir. 2003)...............................................................................................8

*Ekchian v. Home Depot, Inc.*,
    104 F.3d 1299 (Fed. Cir. 1997).............................................................................................21

*Innova/Pure Water, Inc. v. Safari Water Filtration Systems, Inc.*,
    381 F.3d 1111 (Fed. Cir. 2004).............................................................................................20

*Int'l Rectifier Corp. v. IXYS Corp.*,
    361 F.3d 1363 (Fed. Cir. 2004)...............................................................................................3

*Internet America, Inc. v. Kee-Vet Laboratories, Inc.*,
    887 F.2d 1050 (Fed. Cir. 1989)...............................................................................................4

*Johnson World-wide Associates, Inc. v. Zebco Corp.*,
    175 F.3d 985 (Fed. Cir. 1999).................................................................................................3

*K-2 Corp. v. Salomon S.A.*,
    191 F.3d 1356 (Fed. Cir.  1999)................................................................... 10-11, 13, 19

*KCJ Corp. v. Kinetic Concepts, Inc.*,
    223 F.3d 1351 (Fed. Cir. 2000)...............................................................................................9

*Mantech Envtl. Corporation v. Hudson Envtl. Servs., Inc.*,
    152 F.3d 1368 (Fed. Cir. 1998).............................................................................................21

*Markman v. Westview Instruments, Inc.*,
    517 U.S. 370 (1996)................................................................................................................2

*Minnesota Mining & Mfg. Co. v. Johnson & Johnson Orthopaedics, Inc.*,
    976 F.2d 1559 (Fed. Cir. 1992)........................................................................Passim

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005) (en banc)....................................................Passim

*Pickholtz v. Rainbow Techs., Inc.*,
    284 F.3d 1365 (Fed. Cir. 2002)..................................................................................2

*Scanner Technologies Corp. v. ICOS Vision Systems Corp., N.V.*,
    365 F.3d 1299 (Fed. Cir. 2004)..................................................................................9

*Scripps Clinic & Research Foundation v. Genentech, Inc.*
    927 F.2d 1565 (Fed. Cir. 1991)..................................................................................2

*Semitool, Inc. v. Dynamic Micro Systems Semiconductor Equipment GmbH*,
    444 F.3d 1337 (Fed. Cir. 2006)..................................................................................2

*Tate Access Floors, Inc. v. Interface Architectural Res., Inc.*,
    279 F.3d 1357, 1370 (Fed. Cir. 2002) ......................................................................9

*Teleflex, Inc. v. Ficosa N. Am. Corp.*,
    299 F. 3d. 1313 (Fed. Cir. 2002).................................................................................2

*Texas Instruments, Inc. v. ITC*,
    805 F.2d 1558 (Fed. Cir, 1986)...........................................................................Passim

*Vitronics Corp. v. Conceptronic, Inc.*,
    90 F.3d 1576 (Fed. Cir. 1996)..........................................................................2, 4-5

RULES

35 U.S.C. § 251.............................................................................................................11, 13

## I.    INTRODUCTION

Pursuant to the Court's Forth Amended Scheduling Order, Baldwin Graphic Systems, Inc. ("Baldwin") submits this brief in support of its proposed construction of the asserted claims of U.S. Patents Nos. Re 35,976 ("the Reissue patent") and 5,974,976 ("the '976 patent") (collectively, "the asserted patents").[1]  The Reissue patent, entitled "Pre-Packaged, Pre-Soaked Cleaning System and Method For Making The Same", relates to a pre-packaged, pre-soaked blanket cleaning system to clean the blankets on the cylinders of offset printing presses, employing a roll of cleaning fabric which has been pre-soaked with low VOC solvent prior to being mounted on a printing press, and placed in a sealed sleeve.  The '976 patent, entitled "Cleaning System And Process For Making Same Employing Reduced Air Cleaning Fabric" relates to an improved pre-soaked cleaning system for cleaning the blankets on the cylinders of offset printing presses, employing a roll of cleaning fabric with a reduced volume of air which has been pre-soaked with low VOC solvent prior to being mounted on a printing press.  This Markman brief begins by setting forth the applicable law governing claim construction.  See Section II, *infra*. It then provides an overview of the Reissue patent, and applies the applicable governing law to disputed terms from asserted claims 28, 29, 31 and 32 of the Reissue patent. See Section III, *infra*.  This brief also provides an overview of the '976 patent and applies the applicable governing law to disputed terms from asserted claims 1, 7, 9, 12, 13, 14, 15, 16, 18, 21, 23, 24 and 25 of the '976 patent.  See Section IV, *infra.*

---

[1]    A copy of RE35,976 ("the Reissue Patent") and 5,974,976 ("the '976 patent") are attached to the Declaration of Keith McWha in Support of Baldwin's Opening Markman Brief as EXHIBITS A and B respectively, citations to which are in the format XX:YY-YY, where XX is the column and YY-YY are the line numbers where cited material can be found.

## II.    APPLICABLE LEGAL PRINCIPLES OF PATENT CLAIM CONSTRUCTION

The construction of patent claims is a question of law subject to court determination.  *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 384 (1996). Claim construction is a "way of elaborating the normally terse claim language: in order to understand and explain, but not to change, the scope of the claims."  *Scripps Clinic & Research Foundation v. Genentech, Inc.* 927 F.2d 1565, 1580 (Fed. Cir. 1991).

### A.    Patent Claims Are Interpreted In View Of The Claim Language, Patent Specification And Prosecution History

"To ascertain the meaning of claims, [the court will] consider three sources: the claims, the specification, and the prosecution history."  *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996).  These sources are considered "intrinsic evidence" of claim construction. *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996); *Pickholtz v. Rainbow Techs., Inc.*, 284 F.3d 1365, 1372-3 (Fed. Cir. 2002).  Intrinsic evidence must be interpreted by the court as it would be interpreted by a person of ordinary skill in the relevant art.  *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F. 3d. 1313, 1325 (Fed. Cir. 2002).

#### 1.    The Claim Language Is the "Analytical Focus" of Claim Construction

When construing claims, the court must initially "look to the words of the claims themselves…to define the scope of the patented invention."  *Semitool, Inc. v. Dynamic Micro Systems Semiconductor Equipment GmbH*, 444 F.3d 1337, 1346 (Fed. Cir. 2006).  The words of a patent claim are to be given the ordinary and customary meaning they would have to a person of ordinary skill in the art at the time of the invention.  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313-14 (Fed. Cir. 2005) (en banc).  Sometimes "the ordinary meaning of claim language as

understood by a person of skill in the art may be readily apparent even to lay judges." *Id*. at 1314. The court may, however, if necessary consider dictionary definitions in determining the ordinary meaning of claim terms. *Id*. at 1318. However, claim construction is not a "battle of the dictionaries" removed from the context of the patent. If the Court chooses to refer to dictionaries as part of its claim construction, and there are alternative meanings, it should choose the meaning which is most consistent with the patent specification as a whole.

Although the meaning of claim terms must be considered from the perspective of one ordinarily skilled in the art, that does not mean the inventor's actual word choices may be ignored. *Int'l Rectifier Corp. v. IXYS Corp.*, 361 F.3d 1363, 1371 (Fed. Cir. 2004). "[T]he language of the claim frames and ultimately resolves all issues of claim interpretation." *AbTox, Inc. v. Exitron Corp.*, 122 F.3d *1019, 1023, modified on reh'g*., 131 F.3d 1019 (Fed. Cir. 1997). "Because the patentee is required to 'define precisely what his invention is'…it is unjust to the public, as well as an evasion of the law, to construe it in a manner different from the plain import of its terms." *Phillips*, 415 F.3d at 1312 (quoting *White v. Dunbar*, 119 U.S. 47, 52 (1886)). Hence, the construction of the claims must find some textual support within the language of the claims. *Johnson World-wide Associates, Inc. v. Zebco Corp.*, 175 F.3d 985, 990 (Fed. Cir. 1999). While properly construing claim language, a court may not rewrite patent claims to either eliminate language chosen by the patentee or to add language not originally in the claims. *See Chef American, Inc. v. Lamb-Weston, Inc.*, 358 F.3d 1371, 1374 (Fed. Cir. 2004) ("This court….repeatedly and consistently has recognized that courts may not rewrite patent claims…").

**2.    When Construing Claims The Patent Specification And Prosecution History Should Be Considered**

The specification should always be consulted in deriving the meaning and scope of the patent claims. *Phillips*, 415 F.3d at 1315. Although it is proper to consult the specification in deriving the meaning of claim language, "[t]his is not, however, to be confused with reading into a claim a limitation appearing in the specification but not in the claim" *Minnesota Mining & Mfg. Co. v. Johnson & Johnson Orthopaedics, Inc.*, 976 F.2d 1559, 1566 (Fed. Cir. 1992). This Court "has consistently adhered to the proposition that courts can not alter what the patentee has chosen to claim as his invention, that limitation appearing in the specification will not be read into the claim." *Internet America, Inc. v. Kee-Vet Laboratories, Inc.*, 887 F.2d 1050, 1053 (Fed. Cir. 1989). This Court has also "cautioned against limiting the claimed invention to preferred embodiments or specific examples of the specification." *Texas Instruments, Inc. v. ITC*, 805 F.2d 1558, 1563 (Fed. Cir, 1986) (citation omitted); *see also Phillips*, 415 F.3d at 1323.

When construing claims, in addition to the specification, consideration should also be given to the patent's prosecution history. *Phillips*, 415 F.3d at 1317. The prosecution history is a good source of evidence regarding how the U.S. Patent & Trademark Office and the inventor understood the patent. *Id*. The prosecution history should also be consulted to exclude any claim interpretation that was disclaimed during prosecution. *Id*.

**B.    Limits On The Use Of Extrinsic Evidence In Claim Interpretation**

Ordinarily, intrinsic evidence is sufficient to resolve any ambiguities in determining the meaning of disputed claim terms. *Vitronics Corp.*, 90 F.3d at 1582-3. If after consideration of the available intrinsic evidence, claim terms still remain ambiguous, the court may consider extrinsic evidence including the testimony of expert witnesses. *Bell & Howell*

*Document Management Prods. Co. v. Altek Systems*, 132 F.3d 701, 706 (Fed. Cir. 1997). It should be noted that extrinsic evidence and particularly expert testimony may not be used to change or contradict claim terms. *Vitronics Corp.*, 90 F.3d at 1584. Furthermore, expert witness testimony should be treated with extreme caution and "may only be relied upon if the patent documents, taken as a whole are insufficient to enable the court to construe disputed claim terms. Such instances will rarely, if ever occur." *Id.* at 1585. "[C]onclusory, unsupported assertions by experts as to the definitions of a claim term" are under no circumstances useful in interpreting claim language. *Id.*

**III. THE REISSUE PATENT DESCRIBES AND CLAIMS A PRE-PACKAGED, PRE-SOAKED CLEANING SYSTEM AND METHOD FOR MAKING THE SAME**

    **A. The Invention Of The Reissue Patent**

The invention of the Reissue patent relates to a pre-packaged, pre-soaked blanket cleaning system to clean the blankets on the cylinders of offset printing presses. [Reissue / 1:14-16]. Blanket cleaning systems and methods in the prior art usually required apparatus such a pumps, spray bars, manifold lines, valves, and the like for introducing cleaning solvents or solutions to a small portion of the cleaning fabric just prior to actual use. [Reissue/ 1:64-67, 2:1]. Moreover, even where a small portion of the cleaning rolls or fabric rolls were pre-soaked or pre-wetted, the pre-soaking or pre-wetting had to be accomplished while the roll of fabric was mounted on the press just before use in order to minimize loss of cleaning solvent or solution in order to provide an effective blanket cleaning system. [Reissue/ 2:1-6]. Thus prior to the invention in the Reissue patent there was a need for a cloth type blanket cleaning system that did not have the disadvantage of requiring apparatus such as pumps, spray bars, manifold lines, valves, or similar equipment to introduce cleaning solvents to the cleaning fabric just prior to actual use. [Reissue/ 2:7-9].

Prior to the invention of the Reissue patent, there were two major drawbacks in applying solvent to the cleaning fabric while mounted on the printing press just prior to use. First, constant maintenance was required to insure proper operation. For example, if the filters used to capture foreign particles in the solvent were not cleaned periodically, less solvent would be dispensed, resulting in inadequate cleaning of the printing press.

The second major drawback of prior art solvent application systems was inefficiency in applying solvent to the cloth. Because of this inefficiency, more high volatility (VOC) solvent than needed was dispensed to the system. Most of this excess solvent ended up in the surrounding air, where it readily evaporated because of high volatility, and adversely affected air quality. With the advent of low volatility (VOC) solvents mandated by various regulatory authorities, this drawback became even more problematic because instead of evaporating, the excess air-borne solvent formed a fog. The droplets forming the fog then coalesced on various parts of the press, causing the solvent to drip. These drips created several problems including marking of the printed material, increasing press recovery and start-up time after blanket washing, and deterioration of lamps used for curing UV inks on sheetfed presses.

The invention of the Reissue patent employs a fabric roll presoaked with low VOC solvent prior to being mounted on the printing press. The fabric is disposed around a core and enclosed in a sealed sleeve disposed around and in contact with the fabric roll [Reissue/ 10:50-54]. This inventive combination has many advantages over earlier systems. Severe problems due to fogging that prior printers with automatic blanket cleaning systems encountered when they began to use low VOC solvents. This is a classic "failed attempt" to find a solution by substituting a low VOC solvent for a high VOC solvent in the prior art system. The invention in contrast represents a novel and un-obvious solution of using a cloth or fabric roll

which is entirely presoaked with solvent before being mounted on the press. Thus, solvent was only applied where needed to clean the press blanket and hardly any was wasted through evaporation into the surrounding air, compared to prior art cloth type automatic blanket cleaners where solvent was sprayed on a small portion of the cloth while mounted on the press just prior to actual use. Also with less solvent evaporation, there was a corresponding reduction in the VOC emission rate, which had come under increasing scrutiny from environmental protection agencies. Finally, the invention of the Reissue patent reduced the capital cost of the cloth type automatic blanket cleaning system by eliminating the components used to meter and apply solvent to the cloth, including pumps, spray bars, manifold line, valves, or similar equipment. Hence, the reliability of the system was increased and the need for periodic maintenance was reduced.

This inventive approach was at first met with skepticism in the industry, as operators of printing plants believed that the varied operating demands of printing presses required the ability of the prior art spray bar system to vary the amount of solvent on the fabric during cleaning. Eventually, this skepticism was replaced by widespread industry acceptance and industry awards for advancing technology in the printing industry.

### B.    The Asserted Claims Of The Reissue Patent

Baldwin has alleged that Fiberweb Simpsonville, Inc. and Fiberweb, Inc. ("Fiberweb") are infringing Reissue patent claims 28, 29, 31 and 32. These claims are as follows.

28. A pre-packaged, pre-soaked cleaning system for use to clean the cylinders of printing machines comprising:

(1) a pre-soaked fabric roll saturated to equilibrium with low volatility organic compound solvent disposed around a core, and

(2) a sealed sleeve disposed around and in contact with said fabric roll, whereby the pre-soaked, saturated fabric roll can be transported and stored vertically and horizontally until use without

substantially disturbing the distribution of said solvent in said fabric roll and detrimentally affecting the cleaning ability of the fabric.

29. A pre-packaged, pre-soaked cleaning system as defined in claim 28 wherein the sealed sleeve can be opened or removed from the fabric roll for use of said fabric roll and including in combination therewith means for positioning said pre-packaged, pre-soaked cleaning system adjacent a cylinder to be cleaned.

31. A pre-packaged, pre-soaked cleaning system as defined in claim 28, in combination with mounting means for mounting the pre-soaked fabric roll in a position to clean a cylinder while the fabric is in contact with and being fed past said cylinder.

32. A pre-packaged, pre-soaked cleaning system for use to clean the cylinder of printing machines comprising in combination:

(1) a pre-soaked fabric roll saturated to equilibrium with cleaning solvent disposed around a core, said fabric roll having a sealed sleeve which can be opened or removed from said fabric roll for use of said fabric roll, disposed therearound, and said system including

(2) means for locating said fabric roll adjacent to and operatively associated with a cylinder to be cleaned.

[Reissue/ 10:48-65, 11:4-11, 12:1-7]

### C. The Construction Of The Reissue Patent Claims

#### 1. Independent Claims 28 and 32-Disputed Term "A Pre-Soaked Fabric Roll" Does Not Mean "A Single Pre-Soaked Fabric Roll"

Baldwin's proposed construction of the term "a pre-soaked fabric roll" is "one or more pre-soaked fabric rolls". Fiberweb's position that this term means "a single pre-soaked fabric roll" is wrong as a matter of legal claim construction.[2] "It is well settled that the term 'a' or 'an' ordinarily means 'one or more.'" *CollegeNet Inc. v. ApplyYourself, Inc.*, 418 F.3d 1225,

---

[2]     Fiberweb Simpsonville, Inc. and Fiberweb, Inc. state their claim construction positions on claim terms of the RE 35, 976 and US 5, 974,976 patents in Defendants' Third Supplemental Responses to Plaintiff's First Set of Interrogatories (Nos. 1-4).

1232 (Fed. Cir. 2003) quoting *Tate Access Floors, Inc. v. Interface Architectural Res., Inc.,* 279 F.3d 1357, 1370 (Fed. Cir. 2002).  Moreover, when the article "a" is used in "open" patent claims, *i.e.*, claims using the transition "comprising," the Court should interpret the article "a" as referring to "one or more," as opposed to "one."  *KCJ Corp. v. Kinetic Concepts, Inc.*, 223 F.3d 1351, 1356 (Fed. Cir. 2000) ("Unless the claim is specific as to the number of elements, the article 'a' receives a singular interpretation only in rare circumstances when the patentee evinces a clear intent to so limit the article.").

Claims 28 and 32 of the Reissue patent are "open" claims using the transition "comprising" and claiming "a pre-soaked fabric roll."  Claims 28 and 32 are not specific as to the number of pre-soaked fabric rolls which comprise the pre-packaged pre-soaked cleaning system; nor is it the rare circumstance that the patent's inventors have evinced a clear intent in, for example, the patent's specification or file history, to limit the number of rolls to a single roll. Although the Reissue patent specification only specifically describes embodiments with one fabric roll in the sealed sleeve, that is not a proper basis to eschew the general rule and construe the phrase "a pre-soaked fabric roll" as meaning only a single pre-soaked fabric roll.  See *Altiris v. Symantec Corp.*, 318 F.3d 1363, 1373 (Fed. Cir. 2003).  There is nothing in the specification of the Reissue patent indicating that there is a clear waiver of the normal meaning of "a". "Indeed, the very use of the article 'a' indicates, at least presumptively, that the patentee intended the claim language to mean one or more…"  *Scanner Technologies Corp. v. ICOS Vision Systems Corp., N.V.*, 365 F.3d 1299, 1304 (Fed. Cir. 2004).  Thus, claims 28 and 32 of the Reissue patent should be interpreted as claiming "one or more pre-soaked fabric rolls."

2.      **Independent Claims 28 and 32-Disputed Term "Sealed Sleeve" Does Not Mean "A Heat Sealed Sleeve"**

Contrary to Fiberweb's position, Baldwin's proposed construction of the term "sealed sleeve" is not limited to "heat sealing". Fiberweb's position that this term means "a heat sealed sleeve" is wrong as a matter of law. First, the plain meaning of "sealed" is not limited to "heat sealed", as "sealed" means to "prevent leakage", which does not mean leakage could not occur, and sealing is not limited to any one method. See *K-2 Corp. v. Salomon S.A.*, 191 F.3d 1356, 1362-63 (Fed. Cir. 1999) ("The general rule is that the terms in the claims are to be given their ordinary and accustomed meaning. That is the ordinary and accustomed meaning of a disputed claim term is presumed to be the correct one…"). Second there is nothing in the specification indicating the inventors intended the term "sealed" to be limited to "heat sealed." Fiberweb's proposed construction incorrectly imports a limitation from the specification into a claim and limits the claim to a preferred embodiment. See *Minnesota Mining & Mfg. Co. v. Johnson & Johnson Orthopaedics, Inc.*, 976 F.2d 1559, 1566 (Fed. Cir. 1992); *Texas Instruments, Inc. v. ITC*, 805 F.2d 1558, 1563 (Fed. Cir, 1986) (citation omitted); see also *Phillips v. AWH Corp.*, 415 F.3d 1303, 1323-14 (Fed. Cir. 2005) (en banc). Finally, the Reissue file history contains no disavowal of the plain and ordinary meaning of the term "sealed."

In contrast, the file history makes absolutely clear that the inventors chose the language in claims 28 and 32, where "sealed" is used as opposed to "heat sealed" with the intent of broadening what had been claimed in the original claims, all of which used the term "heat sealed" or "heat seal". (See EXHIBIT C - Reissue Application Declaration dated April 10, 1995 at p. 2-3; EXHIBIT D - Reissue Application Declaration dated March 6, 1996 at p. 4; EXHIBIT E - Reissue Amendment After Final Rejection dated August 28, 1996 at p. 14; and [Reissue/ 8:12-67; 9:1-67; 10:1-47]). By statute, a patentee who claims less than he had a right

- 10 -

to claim is permitted to seek reissue of his patent with broaden claims.  35 U.S.C. § 251.  During reissue, Baldwin sought to both amend the specification to change certain references from "heat sealed" and "heat sealable" to "sealed" and "sealable" and also add broadened claims directed to a "sealed sleeve" rather than a "heat-sealed sleeve."  The claim term "sealed sleeve" has a commonly understood meaning and should not be limited to a "heat-sealed sleeve" as this would be contrary to the inventors' intent in seeking the patent's reissue, in order to permissively broaden its claims under 35 U.S.C. § 251.

### 3.    Independent Claim 28-Disputed Term "In Contact With" Does Not Mean "Direct Contact"

Baldwin's proposed construction of the term "in contact with" is not limited to requiring "direct contact".  Fiberweb's position is wrong as a matter of law.  First, the plain meaning of "in contact with" is not limited to "direct contact".  See *K-2 Corp.*, 191 F.3d 1356, 1362-63 (Fed. Cir.  1999) ("The general rule is that the terms in the claims are to be given their ordinary and accustomed meaning.  That is the ordinary and accustomed meaning of a disputed claim term is presumed to be the correct one…").  The American Heritage Dictionary of the English Language: Fourth Edition, defines the term "contact" as "[t]he state or condition of…. immediate proximity".  (For Section 3 dictionary definitions See EXHIBIT F – Excerpts from The American Heritage Dictionary of the English Language: Fourth Edition, 2000).  The term "immediate proximity", a linguistic redundancy, is further defined as "as near or the state, quality, sense, or fact of being near or next; closeness".  The plain meaning of the terms "near", "next" and "closeness" do not imply "direct contact", as objects can be near, close or next to each other without direct contact between these objects.  Thus, on its face, "in contact with" is not limited to requiring "direct contact".

- 11 -

Moreover, Fiberweb's position that the terms, "in contact with" from asserted Reissue claim 28, and "in intimate contact with" found in several unasserted claims, are synonymous and that both terms require "direct contact" is also wrong. The American Heritage Dictionary of the English Language: Fourth Edition, defines the term "intimate": as "[m]arked by close acquaintance, association or familiarity" and "contact" as "[t]he state or condition …of immediate proximity". As a modifier of the term "contact with", the word "intimate" connotes a closer, more direct association or contact than the word "contact" alone. The word "contact" is a more general term and its definition "the state or condition … of immediate proximity" can mean "the state of being near" rather than requiring "direct contact", as Fiberweb proposes. Also, there is nothing in the specification indicating the inventors intended the term "in contact with" to mean "in intimate contact with." Fiberweb's proposed construction incorrectly imports a limitation from the specification into a claim and limits the claim to a preferred embodiment. See *Minnesota Mining*, 976 F.2d 1559, 1566 (Fed. Cir. 1992); *Texas Instruments,* 805 F.2d 1558, 1563 (Fed. Cir, 1986) (citation omitted); see also *Phillips*, 415 F.3d 1303, 1323-14 (Fed. Cir. 2005) (en banc).

Furthermore, the Reissue file history contains no disavowal of the plain and ordinary meaning of the term "in contact with" as requiring "direct contact". The file history makes absolutely clear that the inventors chose the language in independent claim 28, where "in contact with" is used as opposed to "in intimate contact with", with the intent of broadening what had been claimed in the original claims, all of which used the term "in intimate contact with" in regard to the sealed sleeve and the fabric roll. (See EXHIBIT C - Reissue Application Declaration dated April 10, 1995 at p. 2-3; EXHIBIT D - Reissue Application Declaration dated March 6, 1996 at p. 4; EXHIBIT E - Reissue Amendment After Final Rejection dated August

28, 1996 at p. 14;  and [Reissue/ 8:12-67; 9:1-67; 10:1-47]).  By statute, a patentee who claims less than he had a right to claim is permitted to seek reissue of his patent with broader claims. 35 U.S.C. § 251.  During reissue, Baldwin sought to both amend the specification to change certain references from "in intimate contact with " to "in contact with" and also add broader claims directed to a "sealed sleeve" "in contact with" the fabric roll rather than a "heat-sealed sleeve" in intimate contact with" the fabric roll.  The claim term "in contact with" has a commonly understood meaning and should not be limited to "in intimate contact with" as this would be contrary to the inventors' intent in seeking the patent's reissue, in order to permissively broaden its claims under 35 U.S.C. § 251.

### 4.     Independent Claims 28 and 32 Disputed Terms "Disposed Around" and "Disposed Therearound" Do Not Require "Direct Contact"

Contrary to Fiberweb's position, Baldwin's proposed construction of the terms "disposed around" and "disposed therearound" is not limited to requiring "direct contact". Fiberweb's position is wrong as a matter of law.  First, the plain meaning of "disposed around" and "disposed therearound" is not limited to "direct contact".  See *K-2 Corp.*, 191 F.3d at 1362-63 (Fed. Cir.  1999) ("The general rule is that the terms in the claims are to be given their ordinary and accustomed meaning.  That is the ordinary and accustomed meaning of a disputed claim term is presumed to be the correct one…").  The American Heritage Dictionary of the English Language: Fourth Edition, defines the term "dispose" as "[to] place or set in a particular order; arrange".  (For Section 4 dictionary definitions See EXHIBIT G – Excerpts from The American Heritage Dictionary of the English Language: Fourth Edition, 2000). The term "around" is defined as "on all sides" or "[in] close to all sides from all directions", while the term "there" refers to the "place" or the fabric roll at which the sealed sleeve is set.  The plain

meaning of these terms do not imply direct contact in any way. Thus, on its face, "disposed around" and "disposed therearound" are not limited to requiring "direct contact".

Further, there is nothing in the specification indicating the inventors intended the terms disposed around" and "disposed therearound" to require direct contact between the sealed sleeve and the fabric roll. Fiberweb's proposed construction incorrectly imports a limitation from the specification into a claim and limits the claim to a preferred embodiment.  See *Minnesota Mining*, 976 F.2d 1559, 1566 (Fed. Cir. 1992); *Texas Instruments,* 805 F.2d 1558, 1563 (Fed. Cir. 1986) (citation omitted); see also *Phillips*, 415 F.3d 1303, 1323-14 (Fed. Cir. 2005) (en banc).

## IV.    THE '976 PATENT DESCRIBES AND CLAIMS A CLEANING SYSTEM AND PROCESS FOR MAKING SAME EMPLOYING REDUCED AIR CLEANING FABRIC

### A.    The Invention Of The '976 Patent

The invention of the '976 patent relates to an improved pre-soaked cleaning system employing a fabric with a reduced volume of air to clean the blankets on the cylinders of offset printing presses. ['976/ 1:11-14].  Blanket cleaning systems and methods in the art prior to the '976 patent, usually required apparatus such a pumps, spray bars, manifold lines, valves, and the like for introducing cleaning solvents or solutions to a small portion of  the cleaning fabric just prior to actual use.  Further this presoaking of a small portion of the fabric had to be accomplished while the roll of fabric was mounted on the press just before use in order to minimize loss of cleaning solvent or solution in order to provide an effective blanket cleaning system. ['976/ 3:15-25].  Additionally, a subsequent system, which eliminated the need for pumps and spray bars etc., was prone to solvent migration caused by air pockets in the fabric roll that had not been completely evacuated. ['976/ 3:48-50].

The need for the invention in the '976 patent is set forth in its specification as a need for a pre-packaged, pre-soaked blanket cleaning system which was not prone to solvent migration and did not require apparatus such as pumps, spray bars, manifold lines, valves, or similar equipment to introduce solvent to the cleaning fabric while mounted on the printing press just prior to actual use. ['976/ 3:51-54].

The migration of solvent within the fabric roll disturbed the distribution of solvent in the fabric, which could detrimentally affect its cleaning ability.  ['976/ 3:44-54].  Furthermore, the earlier system for applying solvent to the fabric roll required constant maintenance to insure proper operation.  For example, if the filters used to capture foreign particles in the solvent were not cleaned periodically, less solvent would be dispensed, resulting in inadequate cleaning of the printing press.

Additionally, the prior art solvent application system was inefficient in applying solvent to the cloth.  Because of this inefficiency, more high volatility (VOC) solvent than needed was dispensed to the system.  Most of this excess solvent ended up in the surrounding air, where it readily evaporated because of high volatility.  This situation was objectionable because it adversely affected air quality.  With the advent of low volatility (VOC) solvents mandated by various regulatory authorities, this drawback became even more objectionable because instead of evaporating, the excess air-borne solvent formed a fog.  The droplets forming the fog then coalesced on various parts of the press, causing the solvent to drip. These drips created several problems including marking of the printed material, increasing press recovery and start-up time after blanket washing and deterioration of lamps used for the curing UV inks on sheetfed presses.

The invention of the '976 patent, which employs a fabric roll containing fabric with a reduced air content saturated with a low VOC solvent prior to being mounted on the

printing press, has many advantages over earlier systems. First, this inventive combination has the advantage of reducing the air content of the fabric, and prevents and/or reduces the migration of solvent in the fabric roll, which can detrimentally affect its cleaning ability.

Reducing the fabric's air content also may increase the length of fabric that can be placed on a roll without having to increase its diameter, thus, increasing the usable life of the automatic blanket cleaner. ['976/ 3:57-63]. Usable life of a roll means increasing the time a roll is on the press. The increased time allows the press to run longer before shut down and before changing rolls, thereby saving substantial work and resources.

Also as already pointed out, severe problems due to fogging were encountered by printers with automatic blanket cleaning systems when they began to use low VOC solvents. This is a classic "failed attempt" to find a solution by substituting a low VOC solvent for a high VOC solvent in the prior art system. The invention in contrast represents a novel and un-obvious solution of using a cloth or fabric roll. Thus, solvent was only applied where needed to clean the press blanket and hardly any was wasted through evaporation into the surrounding air, compared to earlier cloth type automatic blanket cleaners where solvent was sprayed on a small portion of the cloth on the press while mounted on the press just prior to actual use. Also with less solvent evaporation, there was a corresponding reduction in the VOC emission rate, which had come under increasing scrutiny from environmental protection agencies. Finally, this invention reduced the capital cost of the cloth type automatic blanket cleaning system by eliminating the components used to meter and apply solvent to the cloth, including pumps, spray bars, manifold line, valves, or similar equipment. Hence, the reliability of the system was increased and the need for periodic maintenance was reduced.

- 16 -

The invention of the '976 patent reduced solvent migration within the pre-soaked fabric roll which detrimentally effected performance, increased the usable life of the automatic blanket cleaner by increasing the amount of fabric that could be placed on a roll with out increasing its diameter and eliminated the need for apparatus such as pumps, spray bars, manifold lines, valves, or similar equipment to introduce the cleaning solvent to the cleaning fabric just prior to actual use.

**B.    The Asserted Claims Of The '976 Patent**

Baldwin has alleged that Fiberweb is infringing '976 patent claims 1, 7, 9, 12, 13, 14, 15, 16, 18, 21, 23, 24 and 25. These claims are as follows.

1. A device for cleaning a cylinder of a printing press comprising:

a reduced air content cleaning fabric having an air content by volume reduced by 1 to 50 percent; and

a solvent comprising a low volatility cleaning compound which does not readily evaporate at ambient temperature, and means for introducing said solvent being into said reduced air content cleaning fabric in an amount sufficient for cleaning said cylinder of a printing press.

7. The device for cleaning the cylinders of a printing press as defined in claim 1 wherein the thickness of said fabric has been reduced by between about 10% to about 50%.

9. The device for cleaning a cylinder of a printing press as defined in claim 1 wherein said fabric retains from about 0.02 to about 0.5 cc of said solvent per square inch of said fabric.

12. The device for cleaning a cylinder of a printing press as defined in claim 1 further comprising a means for positioning said fabric adjacent to said cylinder to be cleaned.

13. The device for cleaning a cylinder of a printing press as defined in claim 1 further comprising a mounting means for mounting said core and said fabric in a position to clean said cylinder while said fabric is in contact with and is fed past said cylinder.

14. A method for making a cleaning system comprising:

- 17 -

reducing air content of a strip of cleaning fabric by 1 to 50 percent to form a strip of reduced air cleaning fabric; and

contacting said strip of reduced air content cleaning fabric with a low volatility, organic compound solvent which does not evaporate readily at ambient temperature and pressure and pre-soaking and saturating said reduced air content cleaning fabric with said solvent.

15. The method as defined in claim 14 further comprising the step of sealing said wrapped, saturated cleaning fabric roll in a substantially liquid impervious material so that said wrapped, saturated cleaning fabric roll can be transported and stored vertically and horizontally until use without substantially disturbing the distribution of said solvent in said fabric roll and detrimentally affecting the cleaning ability of said fabric.

16. The method as defined in claim 15 wherein said step of sealing comprises disposing a sealable sleeve around the wrapped, saturated fabric roll and sealing said sealable sleeve around said wrapped, saturated fabric roll.

18. The method as defined in claim 14 including providing an elongated core wherein said strip of cleaning fabric is wrapped about said elongated core prior to contacting said strip of cleaning fabric with said solvent.

21. The method as defined by claim 14 wherein said step of contacting said strip comprises bringing a measured amount of said solvent in contact with said strip of cloth and allowing said measured amount of solvent to be absorbed.

23. The method as defined in claim 14 further comprising the steps of:

(a) unwinding at least a portion of said cleaning fabric from said fabric roll;

(b) placing said at least a portion of said cleaning fabric in contact with a cylinder to be cleaned; and

(c) taking-up said at least a portion of said cleaning fabric on a take-up shaft.

24. The method as defined in claim 14 wherein the step of reducing air content of said strip of cleaning fabric comprises calendaring said cleaning fabric.

25. The method as defined in claim 14 wherein the step of reducing air content of said strip of cleaning fabric is accomplished by reducing the thickness of said cleaning fabric by between about 10% to about 50%.

26. The method as defined in claim 14 wherein said step of reducing air content of said strip of cleaning fabric further comprises the step of increasing the length of said cleaning fabric by at least about 25% without substantially effecting the diameter of said fabric roll after the cleaning fabric has been wound about a core.

['976/ 11:58-67, (12:24-26, 29-32, 40-67), (13:1-2, 7-10, 18-21), 14:1-22]

C.    The Construction Of The '976 Patent Claims

1.    Independent Claims 1 and 14-Disputed Term "Reduced Air Content Cleaning Fabric" Is Not Limited To "A Fabric Whose Air Content Has Been Reduced Prior To Being Wound On A Roll"

Contrary to Fiberweb's position, Baldwin's proposed meaning of the term "reduced air content cleaning fabric" is not limited to a "fabric whose air content has been reduced by some method prior to being wound on a roll". Fiberweb's position is wrong as a matter of law. Baldwin's interpretation of "reduced air content cleaning fabric" is just that, the volume of air in the fabric is reduced at some point prior to the fabric being saturated with cleaning solution. There is no limitation in the claims as to how that air reduction is accomplished.

Baldwin interprets the term "reduced air content cleaning fabric" as including calendared cloth and cloth that has been wound on a roll with sufficient tension to reduce its air content in comparison to its air content prior to winding. Furthermore, as this definition is the plain meaning of the claim term and provides no limitation on its method of achievement, adoption of such a definition is consistent with the legal principles of claim construction. See *K-2 Corp.*, 191 F.3d at 1362-63 (Fed. Cir. 1999) ("The general rule is that the terms in the claims are to be given their ordinary and accustomed meaning. That is the ordinary and accustomed

meaning of a disputed claim term is presumed to be the correct one…").  On its face, "reduced air content cleaning fabric" is not limited to any one method.

      Baldwin's construction of this term is further supported by the specification of the `976 patent which states that: "[t]he preferred, but not exclusive, method of reducing the air content of the fabric is calendaring." ['976/ 7:26-27].  "[E]ven where a patent only describes a single embodiment, claims will not be read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope using words or expressions of manifest exclusion or restriction."  *Innova/Pure Water, Inc. v. Safari Water Filtration Systems, Inc.*, 381 F.3d 1111, 1117 (Fed. Cir. 2004) (internal quote omitted).  The `976 patent inventors Messrs.  Gasparrini and Cano never evinced an intent, either in the specification or the file history to make calendaring the only method a "reduced air content cleaning fabric" can be achieved.  For example, Gasparrini stated during the prosecution of the `976 patent: "[t]he air *may* be removed from a fabric during its manufacture or after its manufacture by a process *such as* calendaring." (emphasis added) (EXHIBIT H – '976 Patent File History Response to Office Action dated June 26, 1996 at p. 7).  On its face, this does not limit the term "reduced air content cleaning fabric" to calendaring or some other method of air reduction that must occur prior to the fabric being wound on the roll.  Also, although the specification is silent as to other methods for reducing a fabric's air content, it does teach that "the present invention…is not limited to the particular embodiments shown and described herein, and that variations may be made which are within the scope of the accompanying claims without departing from the principles of the invention and without sacrificing its chief advantages." ['976/ 11:51-54].

      Fiberweb's position, that the only way to achieve a "reduced air content cleaning fabric" is through calendaring or some other method prior to the fabric being wound on a roll, is

legally erroneous because it improperly imports a limitation from the specification into a claim and limits the claim to a preferred embodiment. See *Minnesota Mining*, 976 F.2d at 1566 (Fed. Cir. 1992); *Texas Instruments,* 805 F.2d at 1563 (Fed. Cir, 1986) (citation omitted); see also *Phillips*, 415 F.3d 1303, 1323-14 (Fed. Cir. 2005) (en banc). It is a long-standing rule of claim construction that the scope of a patent is defined by the claim language, and is not limited to preferred embodiments or examples described in the specification. *Ekchian v. Home Depot, Inc.*, 104 F.3d 1299, 1303 (Fed. Cir. 1997). Indeed, absent an express indication to the contrary in the patent or the prosecution history, it is legal error to limit a patent to its preferred embodiments. *See, e.g., Mantech Envtl. Corporation v. Hudson Envtl. Servs., Inc*., 152 F.3d 1368, 1375 (Fed. Cir. 1998) (holding "The district court erred because it, in essence, incorporated from the preferred embodiment into the claims a narrow definition for the claim term 'well'."). Claims 1 and 14 of the '976 patent do not limit the methods for producing reduced air content fabric and nothing in the patentees' arguments during prosecution mandates a limitation on the term. For all these reasons, Baldwin's claim interpretation should be adopted by the Court.

## V.    CONCLUSION

For the foregoing reasons, Baldwin respectfully requests that the Court adopt its proposed definitions and construe for the RE 35, 976 patent: (1) "a" Pre-soaked Fabric Roll to mean "one or more" as opposed to "one" and (2) "sealed sleeve" to mean the common meaning of "sealed sleeve" that is not limited to "heat sealed" and (3) "in contact with" to mean the common meaning of "in contact with" that is not limited to "direct contact" and (4) "disposed around" and "disposed therearound" to mean the common meaning of "disposed around" and "disposed therearound" that is not limited to "direct contact."

Baldwin respectfully requests that the Court adopt its proposed definitions and construe for the US 5,974,976 patent: (1) "reduced air content fabric" to mean a volume of air in the fabric reduced prior to the fabric being saturated with a cleaning solution, and not limited to a fabric whose air content has been reduced by some method prior to being wound on a roll.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Julia Heaney (#3052)*

_____

Jack B. Blumenfeld (#1014)
Julia Heaney (#3052)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE  19899-1347
(302) 658-9200
jheaney@mnat.com
  *Attorneys for Plaintiff,*
  *Baldwin Graphic Systems, Inc.*

OF COUNSEL:

James W. Gould
Keith J . McWha
Seth Silverman
MORGAN & FINNEGAN, LLP
3 World Financial Center
New York, NY  10281-2101
(212) 415-8700

Dated: December 14, 2007
1335969

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that on December 14, 2007 I electronically filed the foregoing with the Clerk of the Court using CM/ECF, which will send notification of such filing(s) to the following:

> Francis DiGiovanni
> CONNOLLY BOVE LODGE & HUTZ, LLP

I also certify that copies were caused to be served on December 14, 2007 upon the following in the manner indicated:

### BY E-MAIL
Francis DiGiovanni
CONNOLLY BOVE LODGE & HUTZ, LLP
The Nemours Building
1007 North Orange Street
Wilmington, DE  19899-2207

Michael E. Zeliger
Christopher Centurelli
KIRKPATRICK & LOCKHART NICHOLSON GRAHAM LLP
State Street Financial Center
One Lincoln Street
Boston, MA  02111-2950

*/s/ Julia Heaney (#3052)*
_____
Julia Heaney (#3052)
jheaney@mnat.com